UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MURAT MAGOMEDOVICH ALIEV** | ) | CASE NO: _____ |
| Lenin Ave., 39, Apt. 78 | ) | |
| Kabardino-Balkarian Republic | ) | |
| Nalchik 360051, Russian Federation; | ) | |
| | ) | |
| **BONUM CAPITAL (CYPRUS) LTD** | ) | **COMPLAINT FOR INJUNCTIVE** |
| | ) | **RELIEF** |
| 4, Evagora Papachristoforou | ) | |
| Themis Court, 4th Floor | ) | |
| Flat/Office D3 | ) | |
| Limassol 3030, Cyprus; | ) | |
| | ) | |
| **BONUM CAPITAL INVESTORS CORP** | ) | DATE: April 14, 2026 |
| | ) | |
| Trident Trust Company | ) | |
| (B.V.I.) Limited | ) | |
| Trident Chambers, Road Town | ) | |
| Tortola, P.O. Box 146 | ) | |
| British Virgin Islands; | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| v. | ) | |
| | ) | |
| **UNITED STATES DEPARTMENT OF THE TREASURY** | ) | |
| 1500 Pennsylvania Avenue, NW | ) | |
| Washington, D.C. 20220; | ) | |
| | ) | |
| **SCOTT BESSENT** | ) | |
| **in his official capacity as Secretary** | ) | |
| **of the United States Department of** | ) | |
| **the Treasury** | ) | |
| 1500 Pennsylvania Avenue, NW | ) | |
| Washington, D.C. 20220; | ) | |
| | ) | |
| **OFFICE OF FOREIGN ASSETS CONTROL** | ) | |
| U.S. Department of Treasury | ) | |
| 1500 Pennsylvania Avenue, NW | ) | |
| Freedman's Bank Building | ) | |
| Washington, D.C. 20220; | ) | |
| | ) | |

**BRADLEY SMITH**                                )
**in his official capacity as**                  )
**Director of the United States**                )
**Department of the Treasury's**                 )
**Office of Foreign Assets Control**             )
  1500 Pennsylvania Avenue, NW         )
  Freedman's Bank Building              )
  Washington, D.C. 20220;               )
                                                 )
**UNITED STATES DEPARTMENT**                     )
**OF STATE**                                     )
  Office of the Legal Adviser           )
  Suite 5.600, 600 19th Street NW       )
  Washington, D.C. 20522-0000;          )
                                                 )
**MARCO RUBIO**                                  )
**in his official capacity as**                  )
**Secretary of the United States**              )
**Department of State**                          )
  Office of the Legal Adviser           )
  Suite 5.600, 600 19th Street NW       )
  Washington, D.C. 20522-0000;          )
                                                 )
        *Defendants*.    )

## COMPLAINT FOR INJUNCTIVE RELIEF

Plaintiffs bring this complaint for declaratory and injunctive relief against the U.S. Department of the Treasury, its Office of Foreign Assets Control, the U.S. Department of State, and their officers and employees (collectively, the "Defendants"). In support of this complaint, plaintiffs allege as follows:

### NATURE OF THE CASE

1.      This is an action under Section 706(2) of the Administrative Procedure Act (the "APA"), the International Economic Emergency Powers Act ("IEEPA"), 50 U.S.C. §§ 1701, *et seq.*, and the Constitution of the United States seeking to set aside Defendants' designation of Plaintiffs and denials of Plaintiffs' administrative reconsideration petitions for removal from the U.S. Department of the Treasury's Office of Foreign Assets Control's ("OFAC's") Specially Designated Nationals and Blocked Persons List ("SDN List") submitted pursuant to 31 C.F.R. § 501.807 (2024).

2.      Plaintiff, Murat Aliev, is a Russian national and Swiss resident. In 2013, Mr. Aliev founded, using his own savings, the Bonum Group, an international investment enterprise focused on proprietary trading, i.e., deploying its own capital in equities, private equity, venture capital, real estate, and distressed assets. In 2016, Mr. Aliev became a Swiss resident. In 2018, he relocated his wife and, at that time, three young children to Switzerland, where his wife and children have resided continuously since.

3.      On November 14, 2022, OFAC placed Mr. Aliev and several Bonum Group entities on the SDN List pursuant to Executive Order 14024, determining that there was "reason to believe" that Mr. Aliev "operates or has operated" in the financial services sector of the Russian Federation economy. OFAC also publicly characterized Mr. Aliev as part of a network associated with Russian businessman Suleiman Kerimov (hereinafter the "Russian Businessman").

3

4.    Both bases for the designation are false and lack any support in the administrative record. *First*, the alleged link to the Russian Businessman rests primarily on the fact that Mr. Aliev was a former executive at the Russian Businessman's investment firm. In fact, Mr. Aliev left the Russian Businessman's investment firm to start his own firm nearly a decade before his designation. The designation additionally cites a single, uncorroborated reference in a 2018 news article, that describes Mr. Aliev as a business associate of the Russian Businessman. Mr. Aliev, however, has had no professional or personal relationship with the Russian Businessman for many years. Multiple sanctions risk assessments conducted by international law firms, including Dentons, Cleary Gottlieb, and Miller & Chevalier, confirm that there is no evidence of any connection between Mr. Aliev, the Bonum Group, and the Russian Businessman or his affiliates.

5.    *Second*, the determination that Mr. Aliev operated in the "financial services sector" incorrectly conflated *proprietary* trading with the provision of financial *services*. OFAC's own Evidentiary Memorandum acknowledged that Mr. Aliev's "primary business is proprietary trading" and that he "multiplied his capital" through trading and deals. Proprietary trading, i.e. deploying one's own capital for investment purposes, is not the provision of services to clients. To the extent that Bonum Capital LLC maintained any client-facing brokerage activities, those activities were negligible: eight open accounts, none belonging to sanctioned persons, comprising less than 0.25% of the Bonum Group's assets, and generating less than $10,000 in revenue in 2022. Bonum Capital LLC promptly closed those accounts following its designation. Furthermore, at the time of designation, OFAC did not have a published definition of "financial services sector" under E.O. 14024.

6.    In the more than 1,200 days since designation, Plaintiffs have undertaken comprehensive steps to eliminate any arguable basis for their continued inclusion on the SDN List.

4

As a part of its liquidation process, Bonum Capital LLC terminated all its Russian brokerage, dealer, and securities management licenses in March and April 2024, and all eight client accounts maintained by Bonum Capital LLC under management were closed. Alongside Bonum Capital LLC, two other Russia-based designated entities, Bonum Management LLC and Bonum Investments LLC, were formally liquidated and removed from the Russian Unified State Register of Legal Entities on July 18, 2025. A fourth entity, RB-Estate LLC, was sold in its entirety to unrelated third parties in November 2024. A fifth entity (namely, Limited Liability Company Aviakompaniya Dalnevostochnaya KSM) had been divested before the designation was even imposed.

7.      Throughout this process, Plaintiffs have engaged extensively and cooperatively with OFAC. Over nearly three years, Plaintiffs submitted two delisting petitions, responded to five separate questionnaires, provided two additional voluntary supplemental submissions, and counsel participated in both in-person and video meetings with OFAC. Despite this sustained engagement, OFAC denied the First Delisting Petition on November 18, 2024, relying on information that was outdated, misconstrued, or contradicted by the record, and without providing Plaintiffs prior notice of the adverse information on which it relied. As of the date of this filing, OFAC has not acted on the Second Delisting Petition, filed on February 19, 2025, a delay of more than thirteen months that constitutes a constructive denial.

8.      Meanwhile, OFAC has removed from the SDN List two individuals who were designated on the same date, as part of the same action. Instead of applying the same standard to the Plaintiffs, OFAC has never even offered any explanation for why Plaintiffs remain on the SDN List.

9. Plaintiffs seek judicial relief because the administrative record does not support their designation or OFAC's refusal to remove them from the SDN List. The initial designation was based on factual errors and a misapplication of the operative legal standard. The denial of the First Delisting Petition rested on outdated and misconstrued information. The constructive denial of the Second Delisting Petition disregards Plaintiffs' complete withdrawal from any activity that could constitute operation in the financial services sector of the Russian Federation economy. Defendants' actions are arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, and otherwise not in accordance with law.

## JURISDICTION & VENUE

10. The Court has subject-matter jurisdiction under the Declaratory Judgement Act, 28 U.S.C. §§ 2201(a), 2202, the Administrative Procedure Act, 5 U.S.C. §§ 701-706, and the federal question statute, 28 U.S.C. § 1331, because this action arises under the laws of the United States.

11. This Court may grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a) and § 2202 and Fed. R. Civ. P. 57.

12. Venue is properly in the District of Columbia as this is the district in which the events giving rise to the Complaint occurred and in which Defendants reside. *See* 28 U.S.C. §§ 1391 (b) and (e).

13. The Court has jurisdiction to award attorney's fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(2), and the Court's inherent powers.

## THE PARTIES

14. Plaintiff Murat Aliev ("Mr. Aliev") is a Russian national, Swiss resident, and an international businessman.

15.    Plaintiff Bonum Capital (Cyprus) Ltd ("Bonum Cyprus") is a Cyprus-based holding company established in 2013, having State Registration No. HE322854, and a registered address at 4, Evagora Papachristoforou, Themis Court, 4th floor, Flat/Office D3, Limassol 3030, Cyprus.

16.    Plaintiff Bonum Capital Investors Corp ("Bonum BVI") is a British Virgin Islands-based holding company established in 2016 and having State Registration No. 1902794 and a registered address at Trident Trust Company (B.V.I.) Limited, Trident Chambers, Road Town, Tortola, P.O. Box 146.

17.    A related designated party, Limited Liability Company Bonum Capital ("Bonum Capital") was Russia-based company established in 2011, having Tax ID No. 7722757160 and State Registration No. 1117746760130 and a registered address at vn.ter.g. Municipal District Tverskoy, b-r Tsvetnoy, 15, Building 1, Room 63, Moscow 127051, Russian Federation. It is now closed.

18.    A related designated party Limited Liability Company Bonum Management ("Bonum Management") was a Russia-based company established in 2016, having Tax ID No. 7706444723, State Registration No. 5167746424621 and a registered address at vn.ter.g. Municipal District Tverskoy, b-r Tsvetnoy, 15, Building 1, Room 59, Moscow 127051, Russian Federation. It is now closed.

19.    A related designated party Limited Liability Company Bonum Investments ("Bonum Investments") was a Russia-based holding company established in 2015, having Tax ID No. 7706417487, State Registration No. 1157746124656 and a registered address at vn.ter.g. Municipal District Tverskoy, b-r Tsvetnoy, 15, Building 1, Room 44, Moscow 127051, Russian Federation. It is now closed.

20.    Defendant, Marco Rubio, is a citizen of the United States and serves as the Secretary of State. Mr. Rubio is being sued in his official capacity to enjoin actions beyond his authority and in violation of the Constitution and laws of the United States.

21.    Defendant United States Department of State (the "State Department") is a cabinet-level governmental department led by the Secretary of State, that manages the United States' relationship with foreign governments, international organizations, and the people of other countries. It is located at 2201 C. Street, NW, Washington, D.C. 20520.

22.    Defendant, Scott Bessent, is a citizen of the United States and serves as the Secretary of the Treasury. Mr. Bessent is being sued in his official capacity to enjoin actions beyond his authority and in violation of the Constitution and laws of the United States.

23.    Defendant, United States Department of the Treasury (the "Treasury Department"), is a cabinet-level governmental department, led by the Secretary of the Treasury. In addition to its core objective of promoting economic prosperity and ensuring the financial security of the United States, it implements and administers the U.S. economic sanctions programs. It is located at 1500 Pennsylvania Avenue, NW, Washington, D.C. 20220.

24.    Defendant, Bradley Smith, is the Director of OFAC. Mr. Smith is being sued in his official capacity to enjoin actions beyond his authority and in violation of the Constitution and laws of the United States.

25.    Defendant OFAC is a federal administrative agency of the Treasury Department and is located at 1500 Pennsylvania Avenue, NW, Freedman's Bank Building, Washington D.C. 20220. OFAC is responsible for administering and enforcing economic and trade sanctions against targeted foreign countries and individuals. To accomplish this task, OFAC maintains the SDN List.

## FACTUAL BACKGROUND

### A.  Plaintiffs' Background and Activities Prior to Being Sanctioned by OFAC

26.     Mr. Aliev is a Russian national and Swiss resident born in 1979 in Nalchik, Kabardino-Balkar Autonomous Soviet Socialist Republic (now part of the Russian Federation). Mr. Aliev is married and has four children born from 2009 to 2021. His wife and children have continuously resided in Switzerland since 2018.

27.     Mr. Aliev graduated with a bachelor's degree from Peoples' Friendship University of Russia in 2001 and a master's degree in economics in 2003. Mr. Aliev also received a doctorate degree in international economics from the Academy of Public Service of the President of the Russian Federation in 2006.

28.     In 2003, upon graduation from university, Mr. Aliev joined EnergoStroyKomplekt LLC.

29.     By the end of 2006, Mr. Aliev moved to the treasury and trading department within the group of entities of Nafta Moskva, a now-dissolved investment firm owned by the Russian Businessman.

30.     Aliev resigned from the Russian Businessman's group in April 2013 and used money he had saved while working these various previous jobs to set up his own group of businesses (the "Bonum Group") which focused on distressed assets, proprietary security trading, and identifying and developing business opportunities derived from Mr. Aliev's accumulated expertise and professionalism.

### B.  OFAC Sanctions Under IEEPA

31.     The International Emergency Economic Powers Act, 50 U.S.C. 1701, *et seq.* ("IEEPA"), grants the President of the United States the authority to declare a national emergency to address any unusual and extraordinary threat, originating either wholly or substantially outside

the United States, to the national security, foreign policy, or economy of the United States. 50 U.S.C. § 1701(a). Once the President has declared such an emergency, IEEPA permits the President to impose restrictions, or "IEEPA sanctions," specifically to:

> [ ] block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States.

*Id.* § 1702(a)(1)(B).

32.    IEEPA sanctions regimes are implemented by the creation of sanctions programs that are administered by OFAC, through which OFAC can add persons to the SDN List. Persons subject to sanctions under IEEPA, so-called Specially Designated Nationals ("SDNs"), are said to be on the SDN List. Once SDNs are on the SDN List, they are sometimes described as being subjected to "civil death," insofar as it becomes functionally unlawful for them to be employed, to access banking services, to travel, or to engage in most commerce that is basic to modern life.[1]

33.    IEEPA makes it unlawful for anyone "to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under" the statute. 50 U.S.C. § 1705(a). The consequences of violating IEEPA sanctions can be extremely severe. Anyone who violates IEEPA sanctions, intentionally or not, may be subject to a civil penalty equaling the greater of $377,700 or twice the value of the transaction giving rise to the violation. 31 C.F.R. 560.701(a)(2). Anyone who willfully violates IEEPA sanctions, attempts or conspires to do so, or aids and abets a violation faces criminal fines of up to $1,000,000 and up to

---

[1] *See* Adam Smith, *Dissecting the Executive Order on ICC Sanctions*, JUST SECURITY (June 15, 2020) at https://www.justsecurity.org/70779/dissecting-the-executive-order-on-intl-criminal-court-sanctions-scope-effectiveness-and-tradeoffs/.

twenty years in prison. 50 U.S.C. § 1705(c). The government has also prosecuted people for conspiracy to commit an offense against the United States under 18 U.S.C. § 371 in connection with the planned violation of an IEEPA order.

34.    OFAC is responsible for the civil enforcement of IEEPA sanctions regimes, and it regularly imposes civil penalties on individuals and entities for IEEPA violations.[2]

35.    The Department of Justice is responsible for the criminal enforcement of IEEPA sanctions regimes, and it has frequently prosecuted persons for IEEPA violations.[3]

36.    Thus, IEEPA sanctions trigger two distinct sets of consequences: (1) designation of sanctioned persons and their addition to the SDN List, and (2) enforcement of civil and criminal penalties for dealing in blocked property or providing goods or services to or for the benefit of a designated person. The threat of such penalties deters individuals, financial institutions, and other businesses and entities from interacting with designated persons.

C. Sanctions Designation Against Mr. Aliev by OFAC

37.    In accordance with the provisions of IEEPA, on April 15, 2021, President Joseph R. Biden declared a national emergency after finding that "specified harmful foreign activities of the Government of the Russian Federation constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States" and issued Executive Order ("E.O.") 14024 (Blocking Property With Respect To Specified Harmful Foreign Activities of the Government of the Russian Federation). Exec. Order No. 14,024, 86 Fed. Reg. 20,249 (Apr. 15, 2021).

---

[2] *See Civil Penalties and Enforcement Information*, OFAC, U.S. Dep't of the Treasury, https://ofac.treasury.gov/civil-penalties-and-enforcement-information (last visited Mar. 30, 2026).
[3] *See Summary of Major U.S. Export Enforcement, Economic Espionage, and Sanctions-Related Criminal Cases*, U.S. Dep't of Justice (Nov. 2019), https://www.justice.gov/nsd/page/file/1044446/download.

38.     In Section 1(a)(i) of E.O. 14024, the President delegates to both the Secretary of the Treasury and the Secretary of State, in consultation with each other, the authority to block property and interests in property within the United States, that subsequently comes within the United States, or that are or later come within the possession or control of any United States person, of any persons determined to operate or have operated in the technology sector or the defense and related materiel sector of the Russian economy, or any other sector of the Russian Federation economy as may be determined by the Secretary of the Treasury, in consultation with the Secretary of State.

39.     On February 22, 2022, the Secretary of the Treasury issued a determination that Section 1(a)(i) of E.O. 14024 shall apply to the "financial services sector of the Russian Federation economy."[4]

40.     This determination did not define the term "financial services sector of the Russian Federation economy."

41.     On November 14, 2022, OFAC announced sanctions against Swiss national Alexander-Walter Studhalter (an alleged key player in the Russian Businessman's financial network) and also the "Murat Aliev Network," adding them to the SDN List pursuant to E.O. 14024:

> OFAC designated Russian businessman and investor **Murat Magomedovich Aliev** (Aliev), a former executive at a Kerimov investment firm, who has links to Studhalter. For example, Aliev's Moscow-based investment firm **Limited Liability Company Bonum Capital** (LLC Bonum Capital) is located in the same Moscow building as MG International's Russian branch. Swiss national **Inga Rettich** (Rettich) is another link between Studhalter and Aliev. Rettich, who

---

[4] *Determination Pursuant to Section 1(a)(i) of Executive Order 14024*, OFAC, U.S. Sec'y of the Treasury (Feb. 22, 2022), https://ofac.treasury.gov/media/918726/download?inline.

manages the family office at SwissIAG, is also a director at **Bonum Capital Cyprus Ltd** (Bonum Cyprus), an Aliev-owned Cyprus-based holding company.[5]

42.    Defendant OFAC's Evidentiary Memorandum for then-Director Andrea Gacki determined that the "[i]nformation presented in this memorandum and the accompanying exhibits provides reason to believe that MURAT MAGOMEDOVICH ALIEV (ALIEV) operates or has operated in the financial services sector of the Russian Federation economy, and thus meets the criteria for designation pursuant to section 1(a)(i) of E.O. 14024."[6]

43.    Defendants have no regulatory, statutory, or guidance-based source that defines this "reason to believe" evidentiary standard for its sanctions-designation determinations by and through IEEPA or for their review of administrative reconsideration requests under 31 C.F.R. § 501.807.

44.    In a different regulatory context for determining visa ineligibility grounds, Defendant State Department declares that: "[t]he essence of the standard is that you must have more than a mere suspicion; there must exist a probability, supported by evidence." 9 FAM 302.4-3(B)(3) (U.S. Dep't of State 2024) "Reason to Believe."

45.    Defendants had no definition of the term "financial services sector" of the Russian Federation economy when OFAC designated and placed Mr. Aliev on the SDN List.

46.    For its sole bases for determining that Mr. Aliev "operates or has operated" in the then-undefined financial services sector of the Russian Federation economy," Defendants found that:

---

[5] *Treasury Sanctions Global Russian Military Supply Chain, Kremlin-linked Networks, and Elites with Western Fortunes*, U.S. Dep't of the Treasury (Nov. 14, 2022), https://home.treasury.gov/news/press-releases/jy1102.

[6] OFAC, Evidentiary Mem., undated, Bates 2024-OFP-00021_000002 (obtained through litigation under the Freedom of Information Act & on file with OFAC) (emphasis added).

a.      Mr. Aliev founded an investment firm in 2013, Bonum Capital, an **international** investment fund where the "company's primary business is **proprietary trading**;"

b.      Mr. Aliev "multiplied **his capital** through a series of important deals as well as successful **trading** on financial markets;"[7] and

c.      As of 2021, his company's "**main business** has been trading stocks [and also] private equity, venture capital, Russian real estate and distressed assets."[8]

47.      Defendant OFAC's Evidentiary Memorandum failed to consider relevant factors in the ordinary, contemporary, and common meaning of the terms "services" and "proprietary trading" – specifically, that an individual who uses his own capital to trade stocks through his own companies is *not* providing "services" to clients in the financial sector:

a.      "Services" is "[l]abor performed in the interest or under the direction of others; specif., the performance of some useful act or series of acts for the benefit of another, usu. for a fee <goods and services>. In this sense, service denotes an intangible commodity in the form of human effort, such as labor, skill, or advice;"[9] and

b.      "Proprietary Trading" or "(Prop Trading) occurs when a bank or firm trades stocks, derivatives, bonds, commodities, or other financial instruments in its own account, using its own money instead of using client's money."[10]

48.      There is no allegation in the Evidentiary Memorandum that Mr. Aliev or the Bonum Group provided services to clients in the financial sector.

---

[7] Evidentiary Mem., Bates 2024-OFP-00021_000006 (emphasis added).

[8] *Id*. (emphasis added).

[9] *Service*, Black's Law Dictionary (12th ed. 2024).

[10] *Proprietary Trading*, Corporate Finance Institute (Apr. 30, 2019), https://corporatefinanceinstitute.com/resources/career-map/sell-side/capital-markets/proprietary-trading/.

49.     On November 14, 2022, Director Gacki designated Mr. Aliev pursuant to Section 1(a)(i) of E.O. 14024 for operating or having operated in the (then-undefined) financial services sector of the Russian Federation economy and published a corresponding Notice of OFAC Actions in the Federal Register.[11]

### D. Sanctions Designations Against Similarly Situated Parties

50.     On November 14, 2022, OFAC also designated Alexander-Walter Studhalter pursuant to E.O. 14024 for operating or having operated in the management consulting sector of the Russian Federation economy.

51.     Mr. Studhalter is a Swiss national who OFAC alleged had been a key player in the Russian Businessman's financial network, including managing the Russian Businessman's companies. OFAC also alleged that Mr. Studhalter laundered significant amounts of money on the Russian Businessman's behalf.[12]

52.     On June 7, 2024, Defendant OFAC removed Mr. Studhalter from the SDN List.[13]

53.     On November 14, 2022, Defendant OFAC also designated Swiss-resident Inga Rettich as a member of the "Murat Aliev Network" pursuant to Section 1(a)(vii) of E.O. 14024 for "being or having been a leader, official, senior executive officer, or member of the board of directors of Bonum Cyprus."[14] *See also* Evidentiary Mem., at 8.

54.     On September 30, 2024, Defendant OFAC also removed Ms. Rettich from the SDN List.[15]

---

[11] 87 Fed. Reg. 69390 (Nov. 18, 2022).

[12] *See* U.S. Dep't of the Treasury, *supra* note 5.

[13] *Russia-related Designation Removals*, OFAC, U.S. Dep't of the Treasury (June 7, 2024), https://ofac.treasury.gov/recent-actions/20240607.

[14] *See* U.S. Dep't of the Treasury, *supra* note 5.

[15] Russia-related Designation Removals; Issuance of Russia-related General License; Russia-/Ukraine-related Identification Update, U.S. Dep't of the Treasury (Sept. 30, 2024), https://ofac.treasury.gov/recent-actions/20240930.

**E. Sanctions Against Mr. Aliev's Companies**

55.    Mr. Aliev's companies were also sanctioned on November 14, 2022 as follows:

a.    Bonum Cyprus was designated pursuant to Section 1(a)(vii) of E.O. 14024 for being owned or controlled by, or having acted or purported to act for or on behalf of, directly or indirectly, Mr. Aliev.

b.    Bonum BVI was designated pursuant to Section 1(a)(vii) of E.O. 14024 for being owned or controlled by, or having acted or purported to act for or on behalf of, directly or indirectly, Mr. Aliev.

56.    Additionally, five other companies – from which Mr. Aliev has since either already divested or which have since been liquidated or sold – were also designated:

a.    Bonum Capital, which was formally liquidated and removed from the Russian Unified State Register of Legal Entities on July 18, 2025, was designated pursuant to Sections 1(a)(i) and (vii) of E.O. 14024 for operating or having operated in the financial services sector of the Russian Federation economy and for being owned or controlled by, or having acted or purported to act for or on behalf of, directly or indirectly, Mr. Aliev;

b.    Bonum Management, which was formally liquidated and removed from the Russian Unified State Register of Legal Entities on July 18, 2025, was designated pursuant to Section 1(a)(vii) of E.O. 14024 for being owned or controlled by, or having acted or purported to act for or on behalf of, directly or indirectly, Bonum Cyprus;

c.    Bonum Investments, which was formally liquidated and removed from the Russian Unified State Register of Legal Entities on July 18, 2025, was designated pursuant to Section 1(a)(vii) of E.O. 14024 for being owned or controlled by, or having acted or purported to act for or on behalf of, directly or indirectly, Mr. Aliev;

16

d.      Limited Liability Company Aviakompaniya Dalnevostochnaya KSM, a company from which Mr. Aliev had already divested on August 5, 2022, was designated on November 14, 2022, pursuant to Section 1(a)(vii) of E.O. 14024 for being owned or controlled by, or having acted or purported to act for or on behalf of, directly or indirectly, Mr. Aliev; and

e.      RB-Estate LLC, which was sold in its entirety through two separate agreements executed on November 26, 2024, transferring 100% ownership to third-party buyers, was designated pursuant to Section 1(a)(vii) of E.O. 14024 for being owned or controlled by, or having acted or purported to act for or on behalf of, directly or indirectly, Bonum Investments.

**F.  Delisting Efforts by Plaintiffs**

57.      On April 25, 2023, Plaintiffs, through their former counsel, submitted a delisting application via email to OFAC and the U.S. Department of State requesting the removal of Plaintiffs from the SDN List (the "First Delisting Petition").

58.      On July 31, 2023, Plaintiffs received a questionnaire, or request for further information, from OFAC via email (the "First Questionnaire").

59.      Plaintiffs, through their former counsel, submitted their response to the First Questionnaire to OFAC via email on August 17, 2023 (the "Response to the First Questionnaire").

60.      On May 4, 2024, Plaintiffs, through their undersigned counsel, submitted a supplement to the Delisting Application and Response to the First Questionnaire to OFAC (the "First Questionnaire Supplemental Response").

61.      The First Questionnaire Supplemental Response was voluntarily submitted by Plaintiffs and served a dual purpose: first, to provide OFAC with updated exhibits and information previously requested in the First Questionnaire and responded to on August 17, 2023; and second, to assert additional legal authorities and analysis regarding why the designations were in error and otherwise why the removals from the SDN List were consistent with U.S. policy interests.

17

62.     On May 22, 2024, Plaintiffs, through their undersigned counsel, filed a mandamus complaint in the U.S. District Court for the District of Columbia (the "Court") against the Treasury Department, its Secretary Janet Yellen, OFAC, its Director Bradley Smith, the State Department, and its Secretary Antony Blinken (collectively, the "Mandamus Defendants"), requesting that the Court compel final agency action on the First Delisting Petition (the "Mandamus Complaint").[16]

63.     On August 14, 2024, Plaintiffs received another questionnaire, or request for further information, from OFAC via email (the "Second Questionnaire").

64.     On August 20, 2024, Plaintiffs, through their undersigned counsel, submitted their response to the Second Questionnaire to OFAC via email (the "Response to the Second Questionnaire").

65.     On November 18, 2024, OFAC denied Plaintiffs' petition, asserting that Mr. Aliev and Bonum Capital continued to operate within the financial services sector of the Russian Federation economy (the "Denial Letter") based on alleged derogatory information of which Defendant OFAC did not provide notice or an opportunity to respond.

66.     On January 15, 2025, Plaintiffs and Mandamus Defendants filed a Joint Stipulation of Dismissal requesting the Court dismiss the Mandamus Complaint without prejudice to enable Plaintiffs to address the grounds raised in the Denial Letter before Defendants in another administrative reconsideration petition.

67.     The mandamus case was subsequently closed on January 16, 2025.

68.     On February 19, 2025, Plaintiffs, through their undersigned counsel, submitted a second delisting petition via email to OFAC and the State Department requesting the removal of

---

[16] Compl., *Aliev, et al. v. Blinken*, et al., No. 24-cv-01495-TJK (D.D.C. May 22, 2024).

Plaintiffs from the SDN List to address the unnoticed grounds raised in the Denial Letter (the "Second Delisting Petition").

69.     On April 15, 2025, Plaintiffs received another questionnaire, or request for further information, from OFAC via email (the "Third Questionnaire").

70.     On May 30, 2025, Plaintiffs, through their undersigned counsel, submitted their response to the Third Questionnaire to OFAC via email (the "Response to the Third Questionnaire").

71.     On July 18, 2025, Plaintiffs' counsel met in-person with OFAC to discuss the First and Second Delisting Petitions and to answer any questions.

72.     On July 21, 2025, Plaintiffs, through their undersigned counsel, submitted a supplemental response to the Third Questionnaire to OFAC via its online portal (the "Third Questionnaire Supplemental Response").

73.     The Third Questionnaire Supplemental Response was voluntarily submitted by Plaintiffs to provide OFAC with a status update regarding the disposition of companies owned by Mr. Aliev and subject to sanctions. At the time of the Response to the Third Questionnaire, these companies were in the process of liquidation. The Third Questionnaire Supplemental Response confirmed that the process had been completed and that the companies in question were formally liquidated and removed from the Russian Unified State Register of Legal Entities on July 18, 2025.

74.     On July 30, 2025, Plaintiffs received another questionnaire, or request for further information, from OFAC via email (the "Fourth Questionnaire").

75.     On August 20, 2025, Plaintiffs, through their undersigned counsel, submitted their response to the Fourth Questionnaire to OFAC via email (the "Response to the Fourth Questionnaire").

19

76. On February 27, 2026, Plaintiffs received another questionnaire (the "Fifth Questionnaire") with three short questions. The first question inquired about the details of Mr. Aliev's brief discussion with non-Russian, non-sanctioned individuals about a prospective greenfield project in North-Central Asia, activities that are not subject to U.S. sanctions, fully protected under the Berman Amendments,[17] and which resulted in no substantive actions.

77. For the second and third question, the Fifth Questionnaire also inquired about a shopping mall that Mr. Aliev indirectly owns in Moscow. Specifically, the second question asked about five ATMs located in the mall, for the third question, a shopper loyalty discount program.

78. On March 6, 2026, Plaintiffs' counsel met with OFAC, per OFAC's request, over video teleconference, to discuss the Fifth Questionnaire, where OFAC emphasized its concern over the prospective greenfield project.

79. On March 9, 2026, Plaintiffs, through their undersigned counsel, submitted their response to the Fifth Questionnaire to OFAC via email (the "Response to the Fifth Questionnaire").

80. The Response to the Fifth Questionnaire clarified that no sanctionable conduct of any kind had happened related to the prospective greenfield project and that Mr. Aliev only owns the mall as the ultimate beneficial owner, but does not run, manage, or otherwise control any ATMs or loyalty programs, he does not negotiate, control, or approve the mall's loyalty programs or lease agreements with the ATMs' owners, nor does he benefit from them.

81. As of the date of this filing, despite repeated requests for resolution to OFAC by Plaintiffs' counsel, OFAC has not rendered a decision on Plaintiffs' Second Delisting Petition.

---

[17] 50 U.S.C. § 1702(b).

### G. Inaccuracy of Information in Initial Sanctions Designation

82.     Information that OFAC relied on in making its initial decision to sanction Plaintiffs on November 14, 2022, was misconstrued, is incorrect, or has become out-of-date.

83.     The only detail provided in the press release to justify OFAC's policy decision in targeting Plaintiffs was that the "Murat Aliev Network" was allegedly part of "a global network of financial facilitators, enablers, and others associated with two key Kremlin-linked elites whose fortunes are intertwined with the West." This allegation was only explained by the claim that Mr. Aliev is "a former executive at a Kerimov investment firm, who has links to Studhalter" (apparently the two referenced "key Kremlin-linked elites.")[18]

84.     This link, in turn, was only supported by the claim that Bonum Capital was "located in the same Moscow building as [one of Studhalter's companies]," and that "Rettich, who manages the family office at [one of Studhalter's companies], is also a director at [Bonum Cyprus], an Aliev-owned Cyprus-based holding company."[19]

85.     The claim that Mr. Aliev is "a former executive at a Kerimov investment firm," while true, misleadingly implies a closer relationship or connection than actually exists. Mr. Aliev did work for Nafta Moskva group of entities, an investment firm owned by the Russian Businessman, from 2006 to 2013, but left in 2013 to start his own business (Bonum Group) fully independent of the Russian Businessman or any other of his previous employers. As previously stated, for many years Mr. Aliev has maintained no communication with the Russian Businessman whatsoever.

86.     Per the administrative record received by Plaintiffs via a Freedom of Information Act request, OFAC relied on a single passing reference in a March 8, 2018, S&P Global news

---

[18] *See* U.S. Dep't of the Treasury, *supra* note 5.
[19] *Id.*

article – which was already more than four years old at the time of Plaintiffs' designation – to draw the conclusion of an ongoing relationship between Mr. Aliev and the Russian Businessman. The article inaccurately states that "Bonum Capital [] is affiliated with Russian businessman Suleiman Kerimov."[20]

87.     This claim lacks any corroboration in the administrative record and is discredited by Bonum Capital's consistent and public declarations that Mr. Aliev is its founder and sole owner; copious news articles and industry profiles that describe Mr. Aliev as the founder and sole owner of Bonum Capital; and a series of sanctions risk reports commissioned by Bonum Group companies (provided to OFAC in the First Delisting Petition) from credible law firms including Dentons Europe AO in 2019, Cleary Gottlieb Steen & Hamilton LLP in 2021, and Miller & Chevalier in 2022, which found, *inter alia*, e.g., "no evidence, as of this date, that there is any formal legal connection between Mr. Aliev or the Bonum Group entities and [the Russian Businessman] or Nafta Moskva, and [] further found no evidence that any informal connection exists either. In particular, we found no indication that [the Russian Businessman], his family, Nafta Moskva, or its affiliates are currently shareholders, directors or officers of any Bonum Group Entities."[21]

88.     Upon information and belief, Defendants may have also designated Mr. Aliev on the mistaken belief that the Russian Businessman's son had worked for Bonum Capital.

89.     Bonum Capital, which was founded in 2013, never employed the Russian Businessman's son. Any confusion likely stems from the fact that Bonum Capital did at one time

---

[20] Evidentiary Mem., Bates 2024-OFP-00021_000010.
[21] Ex. O (July 7, 2002 Miller & Chevalier Memorandum re: Bonum Capital LLC – U.S. Sanctions Check) to First Delisting Petition at 1, on file with OFAC.

employ a young trading assistant, an individual with a similar, but differently spelled last name, different nationality, different date of birth, and different place of birth.

90.    The claim that Bonum Capital was "located in the same Moscow building as [one of Studhalter's companies]" is false and is not supported by any evidence presented in the administrative record. From November 2020 through April 2022, Bonum Capital was located at Romanov Lane 4 in Moscow. In April 2022, Bonum Capital moved to Tsvetnoy Boulevard 15 in Moscow. Studhalter's company in question, MG International, was not located in either building. Furthermore, even if the two companies did happen to coincidentally rent office space in the same office building, that would barely qualify as even circumstantial evidence of a connection between them.

**H.  Inaccuracy of Information in Denial Letter**

91.    Information that OFAC relied on in its November 18, 2024 Denial Letter to justify its denial of Plaintiffs' First Delisting Petition was incorrect, out-of-date, or misconstrued.

92.    Furthermore, Defendants did not provide Plaintiffs with an opportunity to respond to this alleged derogatory information in the form of any questionnaire prior to denying the First Delisting Petition on the basis of faulty information.

93.    In the Denial Letter, OFAC relied on four indicia to justify its decision to deny Plaintiffs' petition to be removed from the SDN List: (a) a statement from a Frank Media article; (b) Bonum Capital's maintenance of a public website advertising itself as a Moscow-based investment firm; (c) Bonum Capital remaining listed as "active" in the Russian Corporate Register; and (d) Mr. Aliev's indirect ownership of Bonum Capital and his presence in Russia to meet with Bonum Capital's General Director.

23

### a. The Frank Media Article

94.     As part of the delisting application process, Plaintiffs informed OFAC that Bonum Capital publicly announced on its website in February 2024 that it intended to discontinue and terminate its Russian securities management, dealership, and brokerage licenses. This announcement was followed by official orders from the Central Bank of the Russian Federation revoking the licenses in March and April 2024. Plaintiffs communicated to OFAC that these changes had rendered them unable to continue to do business in Russia, and thus unable to continue to operate in the financial services sector of the Russian Federation economy.

95.     A Frank Media article, dated April 4, 2024,[22] included the following statement from a purported Bonum Capital representative: "This is a technical step that will not affect the group's work in any way, since this license is actually an administrative and regulatory burden for us."

96.     OFAC interpreted this statement as an assertion by Bonum Capital that the termination of licenses in Russia did not have any effect on Bonum Group's ability to operate in Russia and used the statement as evidence to support its conclusion that Bonum Capital continued to operate in the financial services sector of the Russian Federation economy.

97.     This is an unfortunate misinterpretation of an ambiguous and mischaracterized statement which was actually meant to indicate the opposite of OFAC's conclusion. The statement as originally presented in the Frank Media article did not clearly reflect Bonum Capital's position, and was not provided by Bonum Capital, but by a public relations firm.

98.     The article was later amended to clarify that the revocation of Bonum Capital's licenses was a necessary step prior to its liquidation and that the Bonum Group was not engaged

---

[22] Frank Media, Investment company Bonum Capital surrendered all its licenses in Russia, (Apr. 4, 2024), available at:
https://web.archive.org/web/20240405113829/https://frankmedia.ru/160711.

in broker/dealer or securities management activities and had no plans to engage in such activities in the future.[23]

99.     Additionally, the revoked licenses were indeed an administrative and regulatory burden, as their continued existence created compliance challenges for Plaintiffs with OFAC. Plaintiffs actively sought to relinquish these licenses to facilitate their complete withdrawal from the financial services sector of the Russian Federation economy, reinforcing their intent to wind down operations rather than continue them. Furthermore, the initial statement that the license revocation 'will not affect the group's work in any way' was intended to refer only to the future international activities outside of Russia. This is evident given that Plaintiffs made a deliberate decision to cease financial services sector operations in Russia, as demonstrated by the voluntary relinquishment of financial services licenses, which was a necessary first step for initiating the liquidation process of all Russia-based designated entities.

### b.  Bonum Capital's Website

100.     OFAC's Denial Letter alleges that Bonum Capital continued operating in the financial services sector of the Russian Federation economy based on its public website, which identified it as a Moscow-based investment firm. This conclusion is inaccurate and reflects a misunderstanding on OFAC's part regarding the actual purpose and use of the website.

101.     Bonum Capital has never advertised financial services on its now closed website (http://www.bonumcapital.ru/) or otherwise. The website was maintained solely to comply with Russian regulatory requirements. According to Instruction of the Central Bank of the Russian Federation No. 6496-U, dated August 2, 2023, every company holding a financial license is

---

[23] Frank Media, Investment company Bonum Capital surrendered all its licenses in Russia (amended), (Apr. 4, 2024), available at: https://frankmedia.ru/160711.

obligated to disclose certain essential information on a publicly accessible website. Bonum Capital complied with this legal requirement but never used its website as a marketing tool to attract clients or promote financial services.

102.    Additionally, Bonum Capital never employed a marketing specialist and was not engaged in marketing, promoting, or advertising financial services to the public, as the company structure and business model were designed to serve and support its own internal activities only. Bonum Capital's business model was based on proprietary trading, not on providing financial services to third parties.

103.    In February 2024, eight months before the Denial Letter issued by OFAC, Bonum Capital publicly announced on its website that it intended to discontinue and terminate its securities management, dealership, and brokerage licenses. These publications were followed by official orders from the Central Bank of the Russian Federation revoking the licenses in March and April 2024. These announcements were not advertisements but official notifications of Bonum Capital's decision to cancel its licenses.

104.    Following the revocation of its licenses, the only information remaining on the website was an email address for counterparties to submit claims or inquiries related to the wind down then in progress. No financial services were offered and no business operations were conducted through the website after this point. As of the date of this complaint, that website is deactivated and is no longer operational. Bonum Group currently maintains a simple Bonum Capital landing page (https://bonum.capital/) for the exclusive purpose of providing contact information for regulators, such as state registries, in case they need to contact any of the international Bonum Group companies (*i.e.*, companies outside of Russia).

105. Again here, what OFAC pointed to as an indication that Bonum Capital continued to operate in the financial services sector of the Russian Federation was actually the opposite. All steps taken and posted on the website were to comply with Russian law as Bonum Capital actively worked to shut down.

### c. Bonum Capital's Corporate Registry Status

106. OFAC further cited Bonum Capital's continued listing as "active" in the Russian Corporate Register as evidence that the company remained operational.

107. At the time of OFAC's Denial Letter, Bonum Capital remained listed as active in the Russian Corporate Register solely because the tax authorities recorded its liquidation entry only on January 13, 2025. However, at the time of OFAC's Denial Letter, Bonum Capital had already announced cessation of operations; had its licenses revoked by the Russian Central Bank; had completely wound down operations; and had become non-active, non-operational, and in liquidation proceedings.

108. Furthermore, even if Bonum Capital had stayed registered on the Russian Corporate Registry, its ability to operate in the financial services sector of the Russian Federation economy had ceased entirely once Bonum Capital's licenses were revoked. Mere existence on a corporate registry is not evidence of engaging in specific operations of any kind.

### d. Assessment of Mr. Aliev's Ownership and Presence in Russia

109. OFAC's Denial Letter asserted that Mr. Aliev had remained an "active indirect owner" of Bonum Capital, which was evidenced by the fact that he had participated in meetings with Bonum Capital's then-General Director.

27

110. This assertion is insufficient to substantiate OFAC's conclusion that Bonum Capital or Mr. Aliev continued to be involved in the financial services sector of the Russian Federation economy; and again, actually demonstrates that the opposite was true.

111. Mr. Aliev's involvement with Bonum Capital during this time period was strictly limited to facilitating the cessation of its activities, the termination of its licenses, and its liquidation. His meetings with Bonum Capital's then-General Director were solely for administrative purposes, including overseeing the termination of Bonum Capital's brokerage, dealership, and securities management licenses, preparing for the winding-up of Bonum Capital, Bonum Investments, and Bonum Management, and facilitating the sale of RB-Estate LLC by Bonum Investments. To the contrary of OFAC's conclusion, Mr. Aliev's meetings are indicative of the great lengths he was pursuing to *not* be operating or appear to be operating in the financial services sector of the Russian Federation economy.

112. OFAC's focus on Mr. Aliev's meetings with Bonum Capital's then-General Director within Russia suggests that it viewed his mere presence in the country as indicative of continued sanctionable activity. This approach, however, is arbitrary and capricious, particularly in light of the fact that, upon information and belief, OFAC has delisted other petitioners under E.O. 14024 who continue to reside in Russia.

### I.  Plaintiffs' Changed Circumstances

113. The final rationale provided in the Denial Letter for denying Plaintiffs' removal from the SDN List was that Bonum Group companies remained owned, or controlled by, or have acted or purported to act for or on behalf of, directly or indirectly, a person whose interests are blocked pursuant to E.O. 14024 (namely, Mr. Aliev).

114. As Plaintiffs explained to OFAC in their February 19, 2025, Second Delisting Petition and their July 21, 2025, Third Questionnaire Supplemental Response, this information is

outdated and no longer applicable. All Russia-based entities designated under E.O. 14024 have either been sold or formally and completely liquidated.

115.    Bonum Capital ceased operations, became inactive and non-operational, and entered liquidation proceedings after its members resolved to dissolve the company at an extraordinary general meeting on December 24, 2024. Bonum Capital was then formally liquidated and removed from the Russian Unified State Register of Legal Entities on July 18, 2025.

116.    Bonum Investments ceased operations, became inactive and non-operational, and entered liquidation proceedings after its members resolved to dissolve the company at an extraordinary general meeting on December 14, 2024. Bonum Investments was then formally liquidated and removed from the Russian Unified State Register of Legal Entities on July 18, 2025.

117.    Bonum Management ceased operations, became inactive and non-operational, and entered liquidation proceedings after its members resolved to dissolve the company at an extraordinary general meeting on December 14, 2024. Bonum Management was then formally liquidated and removed from the Russian Unified State Register of Legal Entities on July 18, 2025.

118.    RB-Estate LLC was sold in its entirety through two separate agreements executed on November 26, 2024, transferring 100% ownership to third-party buyers.

119.    Limited Liability Company Aviakompaniya Dalnevostochnaya KSM was sold on August 5, 2022, i.e., prior to the date the Plaintiffs were sanctioned.

120.    None of the Russia-based Bonum Group designated companies remain operational or engage in any activities within the financial services sector of the Russian Federation economy.

121.    OFAC has established that its designations are not intended to punish parties *ad infinitum*, particularly after the designated party rectifies the behavior OFAC deems contrary to

29

sanctions policy, and has established a process for removal from the SDN List. This process is outlined in 31 C.F.R. § 501.807, which states, in relevant part:

> (a) **A person blocked** under the provisions of any part of this chapter, including a specially designated national… **may submit arguments or evidence** that the person believes establishes that insufficient basis exists for the sanction or **that the circumstances resulting in the sanction no longer apply. The sanctioned person also may propose remedial steps on the person's part, such as corporate reorganization, resignation of persons from positions in a blocked entity, or similar steps, which the person believes would negate the basis for the sanction.**

31 C.F.R. § 501.807(a) (2024) (emphasis added).

122.    OFAC and, more broadly, U.S. policy favor remedial responses to behavior deemed inconsistent with such policies. The sanctioning of individuals and entities is not intended to survive the elimination of the circumstances giving rise to the sanction. As such, U.S. national security is served by encouraging foreign parties to adapt their behavior in a way that aligns with U.S. laws, not in keeping them sanctioned when the underlying basis is moot. Specifically, OFAC clearly states the following on its website (emphasis added):

> The power and integrity of [OFAC] sanctions derive not only from its ability to designate and add persons to the [SDN List], but also from its willingness to remove persons from the SDN List consistent with the law. **The ultimate goal of sanctions is not to punish, but to bring about a positive change in behavior.** Each year, OFAC removes hundreds of individuals and entities from the SDN List. Each removal is based on a thorough review by OFAC. **Maintaining the integrity of U.S. sanctions is a high priority for OFAC and is the driving principle behind its rigorous review process that evaluates every request for removal individually on its merits and applies consistent standards to all of them.** [24]

123.    If OFAC's policy rationale for sanctioning Plaintiffs was their alleged connection to the Russian Businessman and Mr. Studhalter, Plaintiffs have demonstrated both how those

---

[24] *Filing a Petition for Removal from an OFAC List*, U.S. Dep't of the Treasury, https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/filing-a-petition-for-removal-from-an-ofac-list (last visited Mar. 20, 2026).

connections were overstated and how any connections to them, as minor as they may have been, have long since been severed.

124.    If OFAC's legal basis for sanctioning Plaintiffs was their operation in the financial services sector of the Russian Federation economy, by discontinuing all licenses and completely liquidating Bonum Capital, which was legally authorized to do business in Russia's financial services sector, Plaintiffs have taken clear and verifiable steps to remove themselves from the financial services sector of the Russian Federation economy.

125.    For a brief period of time, at the date of the designation on November 14, 2022, Bonum Capital did have a small portfolio of clients, whose total assets under management comprised less than 0.25% of Bonum Group's holdings, none of whom were SDNs or politically exposed persons. In 2022, the total revenue generated from Bonum Capital for its services to these eight individuals was less than USD10,000. One account was closed on May 25, 2023, and the remaining seven accounts were closed on February 29, 2024 during the pendency of the First Delisting Petition.

126.    Although Plaintiffs maintain that their addition to the SDN List by OFAC was an error based on incorrect information and mistaken assumptions (particularly given that OFAC does not cite these negligible services in its Evidentiary Memorandum), even setting that aside, Plaintiffs have undertaken extreme and comprehensive "remedial steps" to demonstrate that "the circumstances resulting in the sanction no longer apply:"

a.    On March 12, 2024, Bonum Capital terminated its license to carry out dealer activities during the First Delisting Petition;

b.    On April 4, 2024, Bonum Capital terminated its licenses to carry out brokerage and securities management activities during the First Delisting Petition;

c.  On November 26, 2024, RB-Estate LLC was sold in its entirety, transferring 100% ownership to third-party buyers, during the First Delisting Petition;

d.  On July 18, 2025, Bonum Capital was formally liquidated and removed from the Russian Unified State Register of Legal Entities during the Second Delisting Petition;

e.  On July 18, 2025, Bonum Investments was formally liquidated and removed from the Russian Unified State Register of Legal Entities during the Second Delisting Petition;

f.  On July 18, 2025, Bonum Management was formally liquidated and removed from the Russian Unified State Register of Legal Entities during the Second Delisting Petition;

g.  Over a delisting process that has spanned nearly three years, Plaintiffs have timely and comprehensively responded to five separate questionnaires and submitted two additional supplemental responses of their own volition, demonstrating extraordinary patience and transparency.

## J. Cases of Similarly Situated Persons

127.  When making decisions, an agency is required to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."[25] The D.C. Circuit has held that "[i]t is axiomatic that '[a]n agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so.'"[26] Indeed, a "fundamental norm of administrative procedure requires an agency to treat like cases alike"[27] and "[a]n agency must provide an adequate explanation to justify treating

---

[25] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted).
[26] *Kreis v. Sec'y of Air Force*, 406 F.3d 684, 687 (D.C. Cir. 2005) (quoting *Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1258 (D.C. Cir. 1996)).
[27] *Westar Energy, Inc. v. Fed. Energy Regul. Comm'n*, 473 F.3d 1239, 1241 (D.C. Cir. 2007).

similarly situated parties differently."[28] Accordingly, "[i]f an agency treats similarly situated parties differently, its action is arbitrary and capricious in violation of the APA."[29]

128.   OFAC, in describing its own reconsideration process, has similarly attested to applying a "rigorous review process that evaluates every request for removal individually on its merits and applies consistent standards to all of them."[30]

129.   On June 7, 2024, OFAC removed Swiss national Alexander-Walter Studhalter and his companies from the SDN List.[31] This is of significant relevance to Plaintiffs because, according to OFAC's own press release, it sanctioned Plaintiffs due to their association with Studhalter and the Russian Businessman.

130.   In fact, the press release alleges a much stronger relationship between Studhalter and the Russian Businessman than it does between Mr. Aliev and either Studhalter or the Russian Businessman. According to OFAC's press release, Studhalter "has been a key player in Kerimov's financial network, including managing Kerimov's companies. Studhalter has also allegedly laundered significant amounts of money on Kerimov's behalf."[32]

131.   In contrast, all that the press release alleges to substantiate an association between Plaintiffs, the Russian Businessman, and Studhalter is that Mr. Aliev once worked for the Russian Businessman many years prior, and that Mr. Aliev had "links to Studhalter" via Bonum Capital allegedly having offices in the same building as one of Studhalter's companies and a former Bonum Cyprus employee allegedly having also worked for a Studhalter company.

---

[28] *Burlington Northern and Santa Fe Ry. Co. v. Surface Transp. Bd.*, 403 F.3d 771, 776 (D.C. Cir. 2005).
[29] *El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. Dep't of Health and Human Serv.*, 300 F. Supp. 2d 32, 42 (D.D.C. 2004), *aff'd*, 396 F.3d 1265 (D.C. Cir. 2005) (citation omitted).
[30] U.S. Dep't of the Treasury, *supra* note 24 (emphasis added).
[31] U.S. Dep't of the Treasury, *supra* note 13.
[32] U.S. Dep't of the Treasury, *supra* note 5.

33

132.    Inga Rettich, that employee, who was designated as part of the "Murat Aliev Network," was also removed from the SDN List by OFAC on September 30, 2024.[33] At the time of Mr. Aliev's designation, Ms. Rettich was no longer a Bonum Cyprus employee having resigned on November 11, 2022.

### K.  OFAC's Definition of Financial Services

133.    On February 22, 2022, the Secretary of the Treasury issued the Determination that Section 1(a)(i) of E.O. 14024 shall apply to the "financial services sector of the Russian Federation economy." This determination, however, did not define the term "financial services sector of the Russian Federation economy."[34]

134.    On May 19, 2023, OFAC issued Frequently Asked Question ("FAQ") 1126 for E.O. 14024, which defined various sectors of the Russian Federation economy, including the architecture, engineering, construction, manufacturing, transportation, technology, defense and related material, and aerospace sectors falling within the scope of Section 1(a)(i) of E.O. 14024.[35]

135.    At the time of Mr. Aliev's designation, FAQ 1126 did not provide a definition for the "financial services sector of the Russian Federation economy." Instead, it stated that OFAC anticipated promulgating regulations that would define four other sectors.

136.    On April 11, 2024, Plaintiffs, through their undersigned counsel and in an effort to comply as fully as possible with OFAC, submitted a Request for Interpretive Guidance via OFAC's online portal, requesting that OFAC provide guidance on the definition of the term "financial services sector of the Russian Federation economy" pursuant to E.O. 14024.

---

[33] U.S. Dep't of the Treasury, *supra* note 15.

[34] U.S. Sec'y of the Treasury, *supra* note 4.

[35] *Russian Harmful Foreign Activities Sanctions, Frequently Asked Questions No. 1126*, OFAC, U.S. Dep't of the Treasury, https://ofac.treasury.gov/faqs/1126 (last visited Mar. 20, 2026).

137.    On January 10, 2025, less than two months after OFAC issued the Denial Letter for Plaintiffs' First Delisting Petition, OFAC finally published an update to FAQ 1126 with public guidance defining the "financial services sector of the Russian Federation economy" under Executive Order 14024. The guidance states that:

> The term financial services sector of the Russian Federation economy includes economic or financial services in, involving the Russian Federation, including government-operated and private banks, depository institutions, credit card companies, investment banking services, foreign exchange services, money services businesses, payday lenders, mortgage companies, securities exchanges, securities dealers, asset managers, insurance companies, other financial institutions, and any persons in the business of accepting deposits, transferring funds, facilitating investment, making, granting, transferring, holding, or brokering loans or credits, or purchasing or selling foreign exchange, securities, commodity futures or options, or procuring purchasers and sellers thereof, as principal or agent; and any related activities, including the provision or receipt of goods, services, or technology involving the financial services sector of the Russian Federation economy.[36]

138.    Plaintiffs' past and present operations do not fit the definition for what OFAC defines as the "financial services sector of the Russian Federation economy."

139.    Defendant OFAC's own Evidentiary Memorandum for Mr. Aliev's designation acknowledged that his primary business is proprietary trading and that since 2013, he has "multiplied his capital through a series of important deals as well as successful trading on financial markets" to include trading stocks.[37]

140.    As Plaintiffs explained to OFAC in their Second Delisting Petition after Bonum Capital terminated Russian-government required licenses for broker-dealer activities:

> [Plaintiffs] are not government-operated or private banks, depositary institutions, credit card companies, investment banking services, foreign exchange services, money services businesses, payday lenders, mortgage companies, securities exchanges, securities dealers, asset managers, insurance companies, or other financial institutions. Plaintiffs are not persons in the business of accepting

---

[36] *Id.*
[37] Evidentiary Mem., Bates 2024-OFP-00021_000006.

deposits, transferring funds, facilitating investments, making, granting, transferring, holding, or brokering loans or credits as principal or agent. [Plaintiffs] are not persons in the business of purchasing or selling foreign exchange, securities, commodity futures or options as principal or agent. [Plaintiffs] are not persons in the business of procuring purchasers and sellers as principal or agent; and any related activities, including the provision or receipt of goods, services, or technology involving the financial services sector of the Russian Federation economy.[38]

141.    With the benefit of the post-designation definition provided by OFAC of "financial services," the record fully establishes that Petitioners neither act as financial institutions nor as persons engaging in brokering activities, dealing activities, or as sales agents. To the extent that any of these categories might have applied to Bonum Group entities in the past for the *de minimis* services Bonum Capital provided to eight clients (which comprised less than 0.25% of the Bonum Group's assets), it does not apply to any of the Plaintiffs now.

## L.  Constructive Denial

142.    Courts can compel agency action unlawfully withheld or unreasonably delayed under 5 U.S.C. 706(1) and can also deem a failure to take action as a constructive denial under 5 U.S.C. 706(2)(A).

143.    It has been more than a year since Plaintiffs submitted the Second Delisting Petition (which occurred on February 19, 2025). To date, OFAC has yet to issue a final agency decision on Plaintiffs' Second Delisting Petition, making it now constructively denied.

## M. Disproportionate Impact of Sanctions on Mr. Aliev and his Family

144.    While imposed by the United States, the sanctions designation against Plaintiffs has had a profound cross-jurisdictional impact, extending fully to Mr. Aliev's assets and operations in multiple countries. Specifically, the sanctions applied to Mr. Aliev have completely restricted his

---

[38] Second Delisting Pet. at 16, Bonum Capital (Cyprus) Ltd, et al. (Feb. 19, 2025), on file with OFAC.

international business activities and have led to the blocking or effective cessation of all foreign banking operations.

145.   Mr. Aliev was even effectively forced to deregister from his family home in Switzerland so that the Swiss bank could accept utility bills from his spouse, since absent such deregistration, the bank treated those payments as made for the benefit of the sanctioned person.

146.   OFAC's incessant questions over years of engagement have also deeply pried into the intimate details of Mr. Aliev's life in a way that violates his right to privacy. For example, Mr. Aliev has been forced to provide information about his religious observance, meetings with his childhood friends, and care for and subsequent funeral of his 90-year-old father to justify his movements as not being illegal or pertinent to OFAC's adjudication. Despite his distress and the profoundly personal nature of these matters, Mr. Aliev has nevertheless complied.

147.   OFAC sanctions imposed on Mr. Aliev have affected not only himself but also his family, including his spouse and minor children, who permanently reside in Switzerland. Measures applied to Mr. Aliev in fact resulted in the freezing of his spouse's international bank accounts, restricting access to standard banking services. The freezing of international accounts and restricted access to banking services have made it nearly impossible to cover essential needs, including taxes, children's tuition, household maintenance, and medical care. The necessity to process these payments in small, irregular installments causes frequent misunderstandings with service providers, placing a disproportionate and unjustified burden on the family.

148.   Mr. Aliev's son was denied admission to school in the UK due to his father's sanctioned status and his daughter's kindergarten in Switzerland requested a legal opinion to clarify whether they were allowed to accept payments from a family whose member is an SDN.

149. Most concerning of all, the public disclosure by OFAC of Mr. Aliev's home address in Switzerland, combined with erroneous media reporting,[39] exposed his family – including a newborn daughter at that time – to serious personal security risks, ultimately culminating in an attempted break-in and subsequent police intervention to defend the Aliev family.

150. All of the above clearly demonstrates that the OFAC sanctions regime, as applied to Plaintiffs, is disproportionate to such an extent that it effectively operates as a form of punishment not only against Mr. Aliev but also against his family, depriving them of the ability to lead a secure and safe life.

**GROUNDS FOR RELIEF**

**<u>CLAIM I</u>**

DEFENDANTS' INITIAL DESIGNATION ACTION IS CLEARLY ERRONEOUS

151. Plaintiffs re-allege and incorporate by reference, as if fully set forth herein, the allegations in all preceding paragraphs.

152. Defendants' designation of Plaintiffs on November 14, 2022, must be reversed if it is "arbitrary and capricious" or if not "based on substantial evidence." *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 162 (D.C. Cir. 2003); 5 U.S.C. 706(2)(A).

153. Defendants' designation for operating in the financial "services" sector of the Russian Federation economy without defining the sector is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law; contrary to constitutional rights; in excess of statutory authority; and taken without required procedure. *See* 5 U.S.C. § 706(2)(A).

---

[39] SwissInfo.ch, *Sanctioned Swiss 'supported Russian military supply chain,'* (Nov. 15, 2022), available at: https://www.swissinfo.ch/eng/business/sanctioned-swiss-supported-russian-militarysupply-chain/48057996.

154.   Defendants' factual finding in the Evidentiary Memorandum that Plaintiff is an international businessman who uses his own capital and engages primarily in proprietary trading is incongruous with Defendants finding that this is the provision of "services" to clients and therefore is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law; contrary to constitutional rights; in excess of statutory authority; and taken without required procedure. *See* 5 U.S.C. § 706(2)(A).

## CLAIM II

### DEFENDANTS' DENIAL OF THE FIRST DELISTING PETITION IS CLEARLY ERRONEOUS

155.   Plaintiffs re-allege and incorporate by reference, as if fully set forth herein, the allegations in all preceding paragraphs.

156.   Defendants' Denial Letter in response to the First Delisting Petition must be reversed if it is "arbitrary and capricious" or if not "based on substantial evidence." *Holy Land Found.*, 333 F.3d at 162; 5 U.S.C. 706(2)(A).

157.   Defendants' Denial Letter failed to cite any evidence to contradict the substantial evidence Plaintiffs brought forward demonstrating that they had abandoned providing "services" in the financial sector of the Russian Federation economy.

158.   Defendants' Denial Letter was also based on false allegations that Plaintiffs could have easily refuted (and since have refuted) if Defendants had provided Plaintiffs the opportunity to do so. However, Defendants, despite multiple rounds of correspondence with Plaintiffs on other subjects, did not provide Plaintiffs that opportunity.

159.   This final agency action must therefore be set aside as arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law; contrary to constitutional rights; in excess of statutory authority; and taken without required procedure. *See* 5 U.S.C. § 706(2)(A).

39

## CLAIM III

### DEFENDANTS' CONSTRUCTIVE DENIAL OF THE SECOND DELISTING PETITION IS CLEARLY ERRONEOUS

160. Plaintiffs re-allege and incorporate by reference, as if fully set forth herein, the allegations in all preceding paragraphs.

161. Defendants' denial of the Second Delisting Petition must be reversed if it is "arbitrary and capricious" or if not "based on substantial evidence." *Holy Land Found.*, 333 F.3d at 162; 5 U.S.C. 706(2)(A).

162. Defendants' constructive denial of the Second Delisting Petition has failed to consider the substantial evidence Plaintiffs brought forward that they had abandoned providing or even being able to provide "services" in the financial sector of the Russian Federation economy. This final agency action must therefore be set aside as arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law; contrary to constitutional rights; in excess of statutory authority; and taken without required procedure. *See* 5 U.S.C. § 706(2)(A).

## CLAIM IV

### DISPARATE TREATMENT OF SIMILARLY SITUATED PETITIONERS

163. Plaintiffs re-allege and incorporate by reference, as if fully set forth herein, the allegations in all preceding paragraphs.

164. Defendants' Denial Letter in response to the First Delisting Petition, and their constructive denial of the Second Delisting Petition, despite granting delisting to similarly situated SDNs Alexander-Walter Studhalter and Inga Rettich, violate the "fundamental norm of administrative procedure [that] requires an agency to treat like cases alike." *Westar Energy,* 473 F.3d at 1241.

165. Alexander-Walter Studhalter was sanctioned for the same associations as Mr. Aliev, indeed, for more serious alleged behavior than Mr. Aliev was alleged to have committed. Inga Rettich was designated as a member of the "Murat Aliev Network." The cases are not only alike in substance but were publicly described by Defendants as being directly connected and related to each other.

166. Despite Defendants' removal of Mr. Studhalter and Ms. Rettich from the SDN List in June and September 2024, respectively, more than 18 months ago, and Plaintiffs explicitly raising this issue with OFAC, OFAC has failed to "provide a legitimate reason for failing to [treat similar cases in a similar manner]." *Kreis*, 406 F.3d at 687 (quoting *Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1258 (D.C. Cir. 1996)).

167. Therefore, by "treat[ing] similarly situated parties differently, [OFAC's] action is arbitrary and capricious in violation of the APA." *El Rio Santa Cruz*, 300 F.Supp.2d at 42 (citation omitted).

## CLAIM V

### DEFENDANTS APPLIED AN IMPROPER EVIDENTIARY STANDARD

168. Plaintiffs re-allege and incorporate by reference, as if fully set forth herein, the allegations in all preceding paragraphs.

169. Defendants' designation of Plaintiffs on November 14, 2022, its denial of the First Delisting Petition on November 18, 2024, and its constructive denial of the Second Delisting Petition (collectively the "Sanction Actions") are based on a "reason to believe" standard that Plaintiffs operate or have operated in the financial services sector of the Russian Federation Economy.

41

170. When courts review an agency action relating to blocking sanctions, "the standard is whether *substantial evidence* supports the finding that" the individual or entity satisfies the designation criteria. *Goetz v. Palluconi*, 775 F. Supp. 3d 189, 200 (D.D.C. 2025) (emphasis added); *see also Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007).

171. Defendants instead applied an undefined "reason to believe" standard despite the substantial evidence Plaintiffs brought forward demonstrating changed circumstances.

172. Black's Law Dictionary defines the noun "reason" as "[a]n expression or statement given by way of explanation of justification; whatever is supposed or affirmed to support a conclusion, inference, or plan of action." *Reason*, Black's Law Dictionary (12th ed. 2024). Defendants have no statutory, regulatory, or policy-guidance setting forth their definition of the reason to believe standard and how they apply it to blocking sanctions under IEEPA.

173. The artificial creation and application of the undefined "reason to believe" standard conflicts with the substantial evidence standard applied by courts when reviewing agency actions under the Administrative Procedure Act and its default preponderance of the evidence standard. The use of an undefined evidentiary standard violates procedural due process and IEEPA, and must therefore be set aside as arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law; contrary to constitutional rights; in excess of statutory authority; and taken without required procedure. *See* 5 U.S.C. § 706(2)(A).

## CLAIM VI

### DEFENDANTS VIOLATED E.O. 14024 THROUGH MISAPPLICATION OF THE PROPER VERB TENSE

174. Plaintiffs re-allege and incorporate by reference, as if fully set forth herein, the allegations in all preceding paragraphs.

42

175.    As relevant here, E.O. 14024 only authorizes blocking sanctions against entities who "operate or have operated" in the financial services sector of the Russian Federation economy. E.O. 14024 § 1(a). There is no dispute that Bonum Capital has ceased providing any "services" in the financial services sector of the Russian Federation economy. Nevertheless, Defendants denied Plaintiffs' First Delisting Petition on the conclusion that "Mr. Aliev and LLC Bonum Capital continue to operate *or have operated* in the financial services sector of the Russian Federation economy."

176.    E.O. 14024 does not authorize the imposition of blocking sanctions for wholly past conduct. It does not authorize the imposition of sanctions against entities that "operate or *operated*" in the Russian economy. It reaches only entities that "operate or *have operated*." This use of "the present-perfect tense conveys to a listener that the event in question continues to be true or valid." *Hewett v. United States*, 606 U.S. 419, 429 (2025).

177.    For Defendants' denial of the First Delisting Petition and constructive denial of the Second Delisting Petition to be proper, Defendants must demonstrate that Plaintiffs' provision of "services" in the financial sector "continues to be true or valid." All the evidence before Defendants, however, shows the contrary. Plaintiffs do not continue to operate in the financial services sector of the Russian Federation economy. The denial of Plaintiffs' First Delisting Petition and the constructive denial of Plaintiffs' Second Delisting Petition must therefore be set aside as arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law; contrary to constitutional rights; in excess of statutory authority; and taken without required procedure. *See* 5 U.S.C. § 706.

## CLAIM VII

### APPOINTMENTS CLAUSE VIOLATION

178. Plaintiffs re-allege and incorporate by reference, as if fully set forth herein, the allegations in all preceding paragraphs.

179. The Director of OFAC's designation and denial of the Delisting Petitions was an exercise of significant authority by a federal employee in violation of the Appointments Clause.

180. Only "Officers of the United States" may exercise "significant authority pursuant to the laws of the United States." That includes officials who exercise "significant discretion" to conduct, find facts, and determine the outcome of agency adjudications. *See*, *e.g.*, *United States v. Arthrex, Inc.*, 594 U.S. 1, 13 (2021); *Lucia v. SEC*, 585 U.S. 237, 248 (2018); *Freytag v. Comm'r*, 501 U.S. 868, 882 (1991). To qualify as an "Officer of the United States" the official must be appointed to an "Office Established by Law" either by the President with Senate confirmation, or in the case of "Inferior Officers" by the President, the Courts, or Department Heads, when that appointment authority is explicitly vested by Congress.

181. The OFAC Director, for his part, is neither appointed by the President, nor the Secretary of the Treasury. To the contrary, the OFAC Director is a career civil service, Special Executive Service position. *United States Government Policy and Supporting Positions* (Plum Book), 2024, at 127. For constitutional purposes, in other words, the OFAC Director is a "mere employee." *Lucia v. SEC*, 585 U.S. 237 (2018).

182. While section 8 of E.O. 14024 directs that the "Secretary of the Treasury may, *consistent with applicable law*, redelegate" all powers granted to the President by IEEPA, no *statute* has empowered the OFAC Director to be a designation authority or vested the appointment of the OFAC Director in the Secretary of the Treasury. E.O. 14024 § 8 (emphasis added).

Furthermore, section 11(a) directs that "[n]othing in this order shall be construed to impair or otherwise affect the authority granted by law to an executive department or agency, or head therefore" and that "[t]his order shall be implemented consistent with applicable law." *Id.* § 11(b). The OFAC Director who designated Plaintiffs, denied the First Delisting Petition, and constructively denied the Second Delisting Petition was not appointed to any office in the manners specified by the Appointments Clause. Rather, the OFAC Director is a civil service employee not appointed to their position.

183. The OFAC Director impermissibly exercised significant authority on behalf of the United States in the Sanction Actions. The Sanction Actions must therefore be set aside as arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law; contrary to constitutional rights; in excess of statutory authority; and taken without required procedure. *See* 5 U.S.C. § 706.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs asks this honorable court to:

1. Enter a judgment declaring that Plaintiffs were improperly designated in violation of E.O. 14024;

2. Enter a judgment declaring that the denial of the First Delisting Petition and the constructive denial of the Second Delisting Petition is not supported by substantial evidence;

3. Enter a judgment declaring that Sanction Actions solely based upon an erroneous "reason to believe" standard of review were arbitrary, capricious, and an abuse of discretion;

4. Enter a judgment setting aside Defendants' designation of Plaintiffs under E.O. 14024;

5. Enter a judgment setting aside Defendants' denial of the First Delisting Petition and the constructive denial of the Second Delisting Petition;

6.      Enter a judgment declaring that the OFAC Director's designation and denial of the Delisting Petitions were exercises of significant authority by a federal employee in violation of the Appointments Clause;

7.      Enter a judgment declaring that Defendants' denial of the Delisting Petitions solely based upon past conduct violates E.O. 14024;

8.      Award Plaintiffs costs and reasonable attorneys' fees incurred in this action; and

9.      Order other such relief as this Court deems proper.

Dated: April 14, 2026

Respectfully submitted,

/s/ Jason D. Wright
Jason D. Wright (DC Bar #1029983)
Michel Paradis (DC Bar #499690)

STEPTOE  LLP
1114 Avenue of the Americas
New York, NY 10036
Tel: +1 212-508-8844
E-mail: jwright@steptoe.com

Scott Johnston
(admission pro hac vice to be submitted)
STEPTOE LLP
1330 Connecticut Avenue, NW
Washington, DC 20036

*Counsel for Plaintiffs*